**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

CHRISTOPHER LINEBERRY,       )
                              )
       **Plaintiff,**       )
**v.**                           )      **Civil Action No. 5:17-04124**
                              )
CASE MANAGER JOHNSON, *et al.*,    )
                              )
       **Defendants.**     )

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court are the following: (1) Defendant Martin's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 25), filed on March 20, 2018; and (2) Defendant Martin's "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 35), filed on April 12, 2018. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendant Martin's Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendant in moving to dismiss. (Document Nos. 28 and 37.) Plaintiff filed his Response and Affidavit on May 17, 2018. (Document Nos. 40 and 41.) Having examined the record and considered the applicable law, the undersigned has concluded that the Defendant Martin's original Motion (Document No. 25) should be denied as moot, and his Supplemental Motion (Document No. 35) should be granted in part and denied in part.

**PROCEDURAL HISTORY**

On October 5, 2017, Plaintiff, acting *pro se* and formerly an inmate at FCI Beckley, filed

his Application to Proceed Without Prepayment of Fees and Complaint in this matter seeking relief pursuant to the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, and for alleged violations of his constitutional and civil rights pursuant to <u>Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971).[1] (Document Nos. 1 and 2.) Plaintiff names the following as Defendants: (1) United States of America; (2) Federal Bureau of Prisons; (3) Correctional Officer Martin; (4) John Doe(s); and (5) Jane Doe(s). (Document No. 2.) In his sworn Complaint, Plaintiff alleges that on July 5, 2016, Defendant Martin physically assaulted Plaintiff in violation of his Eighth Amendment rights. (<u>Id.</u>) Plaintiff explains that he had a prior altercation with Defendant Martin on March 26, 2016. (<u>Id.</u>, pp. 3 – 4.) Plaintiff alleges that Defendant Martin attempted to cause a dispute between Plaintiff and his fiancée during visitation. (<u>Id.</u>) During the same visit, Plaintiff states that another officer (unknown name) accused Plaintiff of attempting to conceal contraband and Plaintiff was moved to the "strip-room" for a search. (<u>Id.</u>) Plaintiff complains that C.O. Lucas then entered the strip-room during the search and exposed Plaintiff's nakedness to people located in the visiting room. (<u>Id.</u>) Plaintiff alleges that Defendant Martin then entered the strip-room again exposing Plaintiff's nakedness to people located in the visiting room. (<u>Id.</u>) Plaintiff acknowledges that during the encounter that he "pointed his finger at Martin and said, 'You're the one who told my fiancée I was e-mailing other women.'" (<u>Id.</u>) Plaintiff alleges that Defendant Martin responded that he "would break Plaintiff's fingers off and send him to medical with his fingers in a bag" and "beat [Plaintiff] three ways to Sunday." (<u>Id.</u>, p. 4.) Plaintiff alleges that he was not allowed to return to

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

his visit until Plaintiff offered an apology that was satisfactory to Defendant Martin. (Id.) Plaintiff alleges that he reported the above harassment to the Warden and SIA Officer. (Id.) Plaintiff contends that the Warden assured Plaintiff that he would not experience any more harassment. (Id.) Plaintiff acknowledges that he was not subjected to any further harassment until July 5, 2016. (Id.)

Plaintiff claims that on July 5, 2016, Defendant Martin assaulted Plaintiff "by applying extreme and unwarranted pressure while cuffing Plaintiff's wrists behind Plaintiff's back." (Id., p. 2.) Plaintiff explains that while he was incarcerated at FCI Beckley, he was taken to the Special Housing Unit ["SHU"]. (Id.) While in the holding cell, Defendant Martin instructed Plaintiff to back up and put his hands through the food tray slot so that Defendant Martin could cuff Plaintiff's hands behind his back. (Id., p. 3.) Plaintiff states that he complied with Defendant Martin's instructions, but Defendant Martin closed the cuffs on Plaintiff's wrists with such force that Plaintiff's "cried out in pain." (Id.) Plaintiff alleges that he informed Defendant Martin that the cuffs were too tight, but Defendant Martin stated something to the effect that "You're lucky that's all I did you." (Id.) Plaintiff states that Defendant Martin then walked away laughing. (Id.) After approximately 45 minutes, a lieutenant arrived at Plaintiff's cell and observed Plaintiff's "distress, and that Plaintiff's right hand, wrist, and arm were abnormal." (Id., pp. 4 – 5.) Plaintiff states that the lieutenant removed the cuff from Plaintiff's left wrist, but due to the condition of Plaintiff's right wrist, the lieutenant called for medical personnel to remove the cuff from Plaintiff's right wrist. (Id., p. 5.) Plaintiff acknowledges that the lieutenant further instructed Defendant Martin to leave the area and called internal affairs to investigate. (Id.) Plaintiff alleges that he was transported to Beckley ARH Hospital for evaluation and treatment. (Id.) Plaintiff acknowledges that x-ray results were negative for a fracture, but he received an injection of Ketorolac and a splint was

applied. (Id.) Plaintiff states that he was returned to FCI Beckley and placed back in SHU. (Id.) Plaintiff states that the following day, on July 6, 2016, he notified Defendant Martin of his extreme pain and Defendant Martin refused to assist Plaintiff. (Id.) Plaintiff states that he pressed his emergency call until Defendant Martin "turned it off." (Id.) Plaintiff states that another inmate pressed his emergency call button on Plaintiff's behalf, but Defendant Martin threatened to charge that inmate with a disciplinary infraction if he pressed the button again on Plaintiff's behalf. (Id., pp. 5 – 6.) Plaintiff alleges that Defendant Martin refused to seek any medical treatment for Plaintiff until mid-afternoon on July 6, 2016. (Id., p. 6.) At this point, Plaintiff contends that he was in extreme pain, his arm was very swollen and discolored. (Id.) Plaintiff states that he was evaluated by Dr. McLain, who made the provisional diagnosis of compartment syndrome. (Id.) Plaintiff states that he was transported to Raleigh General Hospital, where he underwent two surgeries. (Id.) As relief, Plaintiff requests monetary damages. (Id., p. 7.)

As Exhibits, Plaintiff attaches the following: (1) A copy of his "Regional Administrative Remedy Appeal" dated October 26, 2016 (Remedy ID No. 878958-R1) (Id., pp. 9 - 10.); (2) A copy of Regional Director J.F. Caraway's Response to Remedy ID No. 878958-RI dated January 12, 2016 (Id., p. 11.); (3) A copy of Plaintiff's "Request for Administrative Remedy" dated September 21, 2016 (Remedy ID No. 878958-F1) (Id., pp. 12 - 13.); (4) A copy of Warden Thomas B. Smith's Response to dated October 14, 2016 (Id., p. 14.); (5) A copy of Plaintiff's "Central Office Administrative Remedy Appeal" dated March 20, 2017 (Remedy ID No. 87895-A1) (Id., pp. 15 - 16.); (6) A copy of Administrator Ian Connor's Response dated May 5, 2017 (Id., p. 17.); (7) A copy of Plaintiff's "Claim for Damage, Injury, or Death" dated October 20, 2016 (Id., pp. 18 – 20.); (8) A copy of the BOP's acknowledgment letter regarding Administrative Claim Number TRT-MXR-2017-01126 dated November 30, 2016 (Id., p. 21.); and (9) A copy of the BOP's denial

4

letter regarding Administrative Claim Number TRT-MXR-2017-01126 dated April 10, 2017 (Id., pp. 22 - 23.).

By Order entered on October 24, 2017, the undersigned granted Plaintiff's Application to Proceed Without Prepayment of Fees and directed the Clerk to issue process upon receipt of Plaintiff's initial partial payment of the filing fee. (Document No. 7.) On November 20, 2017, the Court received Plaintiff's initial partial payment of the filing fee and the Clerk issued process on the same day. (Document Nos. 8 and 9.) On March 20, 2018, the United States filed its Answer. (Document No. 23.) Also on March 20, 2018, Defendant Martin filed his "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 25 and 26.) Defendant argues that Plaintiff's claim should be dismissed based on the following: (1) To the extent Plaintiff is naming the BOP as a defendant concerning his claim under Bivens, the BOP is an improper Defendant (Document No. 26, p. 1, fn. 1.); (2) The Supreme Court has not established a Bivens cause of action for excessive force claims (Id., pp. 9 – 22.); (3) "Even if a cause of action did exist, there is no constitutional violation" (Id., pp. 22 – 25.); and (4) "The Defendant is entitled to qualified immunity" (Id., pp. 25 – 26.).

As Exhibits, Defendant attaches the following: (1) The Declaration of Dominick McLain, D.O. (Document No. 25-1, pp. 2 – 4.); (2) A copy of Plaintiff's pertinent medical records (Id., pp. 5 – 207.); (3) A copy of a video that is on file in the Clerk's Office (Id., p. 208 and Document No. 29.); (4) The Declaration of Special Investigative Agent ("SIA") A. Hussion (Document No. 25-1, pp. 210 - 212 .); (5) A document entitled "Rigid Handcuffs" (Id., p. 214.); (6) The Declaration of D. Betkijian (Id., pp. 216 - 217.); (7) The Declaration of R. Martin (Id., pp. 219 – 220.); (8) The Declaration of E. Bishop (Id., p. 222.); and (9) The Declaration of K. Kincaid-Wimbish (Id., pp. 224 – 225.).

Notice pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on March 21, 2018, advising him of the right to file a response to Defendant's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgement." (Document No. 28.) On April 12, 2018, Defendant Martin filed his "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document No. 35.) Defendant notes that "this supplemental motion is filed only to correct (add) a paragraph of facts on page 4, first full paragraph, inadvertently omitted from the Motion (ECF 25) but contained in the memorandum of law (ECF 26) page." (<u>Id.</u>) Defendant further state that "[n]o new law or arguments are presented herein." (<u>Id.</u>) Notice pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), was again issued to Plaintiff on April 16, 2018, advising him of the right to file a response to Defendant's "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgement." (Document No. 37.) On May 17, 2018, Plaintiff filed his Response in Opposition and Affidavit in Support. (Document Nos. 40 and 41.) On May 21, 2018, Plaintiff filed as an Exhibit the "Declaration of Rosetta Blackburn." (Document No. 42.)

## SUMMARY OF EVIDENCE

**A.    Declaration of Dominick McLain, D.O.:**

In his Declaration, Dr. McLain states that he is the Clinical Director at FCI Beckley. (Document No. 25-1, p. 2.) Dr. McLain explains that in his position, he has access to central files and medical and psychiatric records of inmates at BOP faculties. (Document No. 25-1, p. 2.) Dr. McLain explains that he reviewed Plaintiff's medical records in response to the instant action. (<u>Id.</u>) Dr. McLain proceeds to provide the following summary of Plaintiff's medical records. (<u>Id.</u>) Plaintiff was involved in a motorcycle accident in 2015, which resulted in a plate being placed in his right wrist. (<u>Id.</u>) Prior to Plaintiff's incarceration, the plate was removed due to increased pain

and increasingly restricted range of motion. (Id.) Plaintiff suffered chronic neuropathic pain in his right forearm and hand due to the motorcycle accident. (Id.)

On June 8, 2016, Plaintiff reported to Health Service at FCI Beckley, that he was experiencing worsening pain in his right wrist. (Id., p. 3.) Plaintiff stated that about two weeks earlier, he felt a pop and sudden onset of new pain while he was doing physical therapy exercises for his wrist against the wall. (Id.) Plaintiff indicated that he believed the distal part of his wrist has moved. (Id.) Plaintiff reported a decreased range of motion since that time. (Id.) Plaintiff explained that he did not report to sick call sooner because the believed it would get better on its own. (Id.) A x-ray was conducted the same day revealing a transverse fracture to the right ulnar styloid process that did not appear to be displaced. (Id.) The x-ray further revealed evidence of an old fracture to the right radius and screw holes from the previous orthopedic hardware. (Id.) A contract Orthopedic Surgeon evaluated Plaintiff the same day. (Id.) The Orthopedic Surgeon noted that the distal right wrist was swollen with mild ecchymosis and increased pain upon palpation over the distal ulna. (Id.) It was noted that Plaintiff retained lateral movement of the wrist, but flexion and extension were limited. (Id.) A forearm brace was applied and Plaintiff was provided with NSAIDS and Tylenol. (Id.)

On June 29, 2016, a follow-up x-ray revealed the fracture of the basilar ulna styloid without any change in alignment. (Id.) A positive ulnar variance of approximately 4 mm and mild swelling of the distal forearm extension region was noted. (Id.) The x-ray report further noted some cortication appearance, indicating the possibility of a chronic fracture injury. (Id.) The old healed fracture deformity of the distal radius at the meta-epiphyseal region was again noted. (Id.)

On July 1, 2016, Plaintiff was evaluated by the contract Orthopedic Surgeon. (Id.) The Orthopedic Surgeon noted a decreased range of motion of the wrist with dorsiflexion of 15 degrees

and palmar flexion of 20 degrees. (Id.) Pain was noted with radial and ulnar deviation, but there was full flexion of the fingers. (Id.) The Orthopedic Surgeon reviewed the x-ray results noting a facture to the ulnar styloid, changes to the distal radius indicative of a healed fracture, and post-surgical changes in the more proximal aspect of the radial shaft. (Id.) The Orthopedic Surgeon's assessment was post traumatic arthritis of the right wrist, history of comminuted right distal radius fracture with plate fixation and removal of hardware, acute ulnar styloid fracture, and arthrofibrosis in the right wrist. (Id.) The Orthopedic Surgeon opined that the previous injury was a significant fracture that likely led to post-traumatic arthritis and arthrofibrosis causing significant dysfunction of the right wrist. (Id.) The Orthopedic Surgeon noted that it was unclear why Plaintiff fractured his ulnar styloid, but it was possibly caused by (1) scar tissue that avulsed the styloid off, or (2) the ulnar styloid was broken in the first injury healing with a fibrous union that was refractured. (Id.) The Orthopedic Surgeon, however, noted that the injury would be treated as an acute fracture. (Id.) Plaintiff was placed in a wrist splint. (Id.) Plaintiff was further instructed to conduct range of motion exercises, continue taking Tylenol and Naprosyn, and return for evaluation in three weeks.[2] (Id.)

On July 5, 2016, Plaintiff was examined by medical staff in the SHU for an injury to his wrist that allegedly occurred at 9:00 a.m. (Id.) Plaintiff informed the Registered Nurse ("RN") that "I was cuffed when I went to the [SHU] and now my right wrist is very painful and swollen." (Id., pp. 3 – 4.) The RN noted swelling to the right ulna at the wrist with pain and tenderness, good radial pulse, good capillary refill, and numbness to the right pinky. (Id., p. 4.) Plaintiff's wrist was elevated and placed in a J splint and ace wrap. (Id.) Plaintiff was transported to the emergency

---

[2] The contract Orthopedic, Dr. Whitfield, noted that "we will allow him to come out of the splint for personal hygiene and for range of motion exercises." (Document No. 25-1, p. 155.)

8

room for evaluation. (Id.) A x-ray was performed, which revealed the following: no evidence of an acute fracture, a prior fracture with the bone healing with adequate bony alignment, and some bone remodeling. (Id.) Upon examination, the ER doctor noted that the ulnar styloid was tender to palpation, but the distal radious and dorsum of the hand was non-tender to palpation and there was no significant soft tissue swelling or deformity to the hand or wrist. (Id.) It was further noted that Plaintiff had normal strength and range of motion. (Id.) Plaintiff was given a shot for pain and returned to the prison. (Id.)

Upon returning to the prison, Plaintiff was examined by medical staff on July 6, 2016, at 10:19 a.m. (Id.) The provider noted that a wrist splint was in place and Plaintiff had redness and swelling. (Id.) It was further noted that Plaintiff had numbness to his 5th digit. (Id.) The provider's assessment was pain to the right wrist with a previous fracture noted. (Id.) The provider noted that the ER report found "no radiographic evidence of acute fracture," but "evidence of prior injury [and] the bones are healing with adequate bony alignment." (Id.) Plaintiff was again evaluated on July 6, 2016, at 2:32 p.m. (Id.) The provider noted that Plaintiff had a prior fracture to the right forearm, and on July 5, swelling developed to the right-hand region with significant pain and no apparent new injury. (Id.) The provider further noted that Plaintiff was transported to the local ER and x-rays revealed no new fracture. (Id.) The provider noted that upon evaluation, Plaintiff now exhibited increased swelling with significant pain with attempts at range of motion of the fingers, his hand was cool to the touch, his nailbeds were somewhat pale, and the skin was taut. (Id.) Plaintiff was sent to the ER to rule out compartment syndrome. (Id.)

As the ER, Plaintiff was examined and an x-ray was conducted. (Id.) The x-ray revealed the following: soft tissue swelling of the dorsum of the right hand, no definable acute fracture, deformity of the distal right radius and ulna from prior fractures. (Id.) The examination of

9

Plaintiff's hand revealed significant swelling, significant paranesthesia throughout the hand in all compartments, fixed flexed contracture of all the fingers and thumb, and diminished sensation to almost no sensation of the first 4 digits both volarly and dorsally. (Id.) It was determined that Plaintiff had compartment syndrome of the right hand and an emergency fasoiotomy with decompression of the hand compartments and carpel tunnel was performed. (Id.) On July 10, 2016, Plaintiff was discharged from the hospital and returned to prison. (Id., p. 5.)

On July 22, 2016, the contract Orthopedic Surgeon at the prison evaluated Plaintiff. (Id.) Plaintiff informed the Orthopedic Surgeon that he was handcuff two weeks prior, which caused him to develop swelling to his right hand resulted in emergency surgery for compartment release of the hand and carpal tunnel release. (Id.) Plaintiff's paresthesia had nearly resolved with only paresthesia in his right middle finger remaining. (Id.) Upon examination, the Orthopedic Surgeon noted the incisions sites were well healed, Plaintiff had paresthesia to touch in the volar aspect of the third digit, and full range of motion in the wrist and digits. (Id.) The Orthopedic Surgeon noted that the paresthesia was liked related to the median nerve and that it would resolve over time, but it could take weeks to months. (Id.)

**B.      Declaration of A. Hussion:**

In his Declaration, A. Hussion states he is the Special Investigative Agent ("SIA") at FCI Beckley. (Id., p. 210.) SIA Hussion explains that in his position he investigates inmate allegations of staff misconduct. (Id.) SIA Hussion states that when an inmate alleges use of excessive force, such claims are referred for investigation to the BOP's Office of Internal Affairs and the Department of Justice's Office of Inspector General for investigation. (Id.) SIA Hussion asserts that a finding of wrong doing can result in prosecution, dismissal from employment, demotion, and a range of other administrative sanction. (Id.) SIA Hussion acknowledges that Plaintiff alleged

10

that Officer Martin used excessive force by placing handcuffs on his wrists too tightly and this allegation was referred to the Office of Internal Affairs and the Office of the Inspector General. (Id.) Upon reviewing Plaintiff's allegations, the Office of Internal Affairs and the Office of the Inspector General directed SIA Hussion's office to conduct a local investigation. (Id., p. 211.)

As part of the investigation, SIA Hussion states that he interviewed staff, viewed a video of the inmate escort, reviewed staff rosters, Lieutenants Logs, and medical records. (Id.) SIA Hussion states that his investigation revealed that on July 5, 2016, at 8:45 a.m., Plaintiff was placed in handcuffs and escorted to the SHU by two officers for placement in SHU pending an investigation for possessing Suboxone. (Id.) Officer Betkijian placed Plaintiff in the SHU visual search cell. (Id.) SIA Hussion notes that "[w]hile inmates are not required to be restrained when secured in the SHU visual search cell, inmates may be restrained while in the cell for various reasons, such as when inmates are being disruptive, have recently engaged in assaultive behavior, or are believed to possess contraband." (Id.) SIA Hussion states that he determined that Officer Betkijian removed the compound officer's handcuffs and placed Plaintiff in SHU handcuffs because he "did not know whether Plaintiff had any contraband on him when he was brought into SHU." (Id.) SIA Hussion further explains the difference between general population handcuffs and SHU handcuffs. (Id.) SIA Hussion states that SHU handcuffs are "rigid handcuffs" and "have a rigid bar in the center, which 'reduces flexibility significantly' and precludes an inmate from moving his wrist up or down." (Id.) SIA Hussion explains that "rigid handcuffs" "incorporate a molded grip that protects an escorting staff member's hand/fingers from being pinched by the handcuff chain." (Id.) SIA Hussion declares that a review of the "video shows Plaintiff was in no distress while Officer Martin and Officer Betkijian escorted him to his SHU cell in SHU handcuffs, and that the escort was routine in nature." (Id.) SIA Hussion explains that the distance from the

SHU visual search cell to Plaintiff's assigned SHU cell was 120 feet and 9 inches." (Id., p. 212) SIA Hussion explains that there are video cameras in SHU, so a portion of the escort at issue was captured on video. (Id.) Specifically, SIA Hussion states that the video showing Plaintiff being escorted from the base of the Range 3 stairs to Plaintiff's assigned cell (a total of one minute and 39 seconds). (Id.) SIA Hussions explains that "[g]iven the distance between the SHU visual search cell and the stairs to Range 3, less than 15 second of the escort was not captured on video." (Id.) SIA Hussion asserts that his investigation found insufficient evidence to substantiate Plaintiff's claim of excessive force by Officer Martin. (Id., p. 211.) SIA Hussion explains that "[w]hile Plaintiff perceived that Officer Martin cinched the handcuffs too tightly, it is possible the rigid handcuffs utilized in SHI made Plaintiff believe the handcuffs were applied too tightly." (Id.) As Exhibits, SIA Hussion attaches a copy of information on the "Rigid Handcuffs" and the escort video. (Id., pp. 208 and 214.)

## C.    Declaration of D. Betkijian:

In his Declaration, D. Betkijian states he is currently a Material Handler Supervisor and was formerly a Correctional Officer at FCI Beckley. (Id., p. 216.) D. Betkijian explains that on July 5, 2016, he was assigned to a post within the SHU and Plaintiff was brought to SHU by two compound officers. (Id.) D. Betkijian states that when Plaintiff arrived in SHU, he placed Plaintiff in the visual search cell. (Id.) D. Betkijian asserts that he removed the compound officer's handcuffs and placed Plaintiff in SHU handcuffs because he did not know whether Plaintiff had any contraband on him. (Id.) D. Betkijian declares that Plaintiff remained in SHU handcuffs for less than five minutes before he was searched for contraband, provided SHU clothing, and assigned a SHU cell. (Id.) D. Betkijian states that Officer Martin escorted Plaintiff from the visual search cell to his assigned SHU cell. (Id.) D. Betkijian claims that he followed Officer Martin while he

escorted Plaintiff to the assigned cell. (Id.) After arriving at the assigned cell, D. Betkijian states that Officer Martin and Plaintiff stood behind him while he placed handcuffs on the inmate already occupying the cell. (Id., p. 216) D. Betkijian asserts that after the other inmate was handcuffed, the cell door was opened and Plaintiff entered the cell. (Id.) D. Betkijian explains that the cell door was then closed, the restraints were removed from Plaintiff and his cellmate through the food slot, and both he and Officer Martin left the range. (Id.) D. Betkijian declares that "Plaintiff did not mention his wrists during the escort, nor did the complain of any pain or inform me or Officer Martin that the restraints were too tight." (Id.)

**D.      Declaration of R. Martin:**

In his Declaration, R. Martin states that on July 5, 2016, he was a Correctional Officer at FCI Beckley assigned to a post within the SHU. (Id., p. 219.) R. Martin states that Plaintiff was brought in handcuffs to SHU that day by two compound officers. (Id.) R. Martin acknowledges that he overhead Plaintiff mention that he had issues with his wrist, but Plaintiff was more concerned about why he had been brought to SHU and he repeatedly asked to speak with SIS staff. (Id.) R. Martin acknowledges that he was present while Plaintiff was searched, but he did not participate in the search. (Id.) R. Martin further acknowledges that he escorted Plaintiff from the visual search cell to his assigned cell and the escort was "routine in nature." (Id.) R. Martin states that he "did not have any out of the ordinary conversation or exchange with Plaintiff." (Id.) R. Martin asserts that Officer Betkijian followed him during the escort and when they arrived at the cell, he stood with Plaintiff in the hallway while Officer Betkijian placed handcuffs on the inmate already occupying the cell. (Id., pp. 219 - 220) After Officer Betkijian opened the cell door, R. Martin states that he followed Plaintiff into the cell and placed his SHU bed roll in the cell. (Id., p. 220.) R. Martin explains that Officer Betkijian then closed the cell door, the inmates' restrains

were removed through the food slot, and him and Officer Betkijian left the range. (Id.) R. Martin declares that Plaintiff did not mention that the cuffs were too tight or complain of any pain during the escort. (Id.) R. Martin further states that he "did not cinch the handcuffs against Plaintiff's wrists as he alleges." (Id.)

**E.    Declaration of E. Bishop:**

In his Declaration, E. Bishop states he is a Correctional Officer at FCI Beckley and he was assigned to a post within the SHU on July 5, 2016. (Id., p. 222.) E. Bishop states that Plaintiff was escorted to his SHU cell by Officers Martin and Betkijian on July 5, 2016. (Id.) E. Bishop states that he unlocked and opened the "grill door" to Range 3 for the officers to pass through and he stood at the grill while the officers escorted Plaintiff to his cell. (Id.) E. Bishop declares that "[t]here was nothing out of the ordinary about the escort." (Id.) E. Bishop contends that "Plaintiff did not mention his wrists, complain of any pain, or inform me that the restrains were too tight." (Id.)

**F.    Declaration of K. Kincaid-Wimbish:**

In her Declaration, K. Kincaid-Wimbish states that she was formerly a SIS Technician at FCI Beckley. (Id., p. 224.) SIS Kincaid-Wimbish states that on July 11, 2016, she spoke with Plaintiff following surgery on his wrist upon Plaintiff's return to the prison. (Id.) SIS Kincaid-Wimbish states that Plaintiff requested to speak to SIS staff about being released from SHU and returned to general population. (Id.) SIS Kincaid-Wimbish declares that during her conversation with Plaintiff, she inquired as to what happed to Plaintiff's hand and "he stated it was not a big deal, it was just an accident, and that Officer Martin 'didn't mean it.'" (Id.) SIS Kincaid-Wimbish states that Plaintiff's focus was "on why he was housed in SHU and whether or not he could be released to general population." (Id., p. 225.) SIS Kincaid-Wimbish states that she explained to

14

Plaintiff that he was not allowed to possess Suboxone and orchestrate drug transactions. (Id.) SIS Kincaid-Wimbish explains that "Plaintiff began to cry and stated his son had sickle cell anemia and was not doing well and he needed to get to the compound so he could talk with his son regularly." (Id.) SIS Kincaid-Wimbish again asked Plaintiff about his wrist, but Plaintiff "focused instead on trying to convince me to release him to the compound." (Id.) SIS Kincaid-Wimbish declares that Plaintiff "eventually told me that Officer Martin cinched hand restraints on his right wrist so tightly that he fractured his wrist."[3] (Id.)

**G.    Declaration of Plaintiff:**

Plaintiff declares that on or about March 26, 2016, his fiancée, Rosetta Blackburn, came to FCI Beckley for a visitation with Plaintiff. (Document No. 41.) Plaintiff states while Ms. Blackburn was being process for visitation, C.O. Martin dishonestly told Ms. Blackburn that Plaintiff had been e-mailing other women. (Id.) Plaintiff explains that during the course of his visitation, he was instructed to return to the inmate "shake-down" room and Plaintiff complied with the order. (Id.) Plaintiff states that C.O. Martin entered the "shake-down" room and directed Plaintiff to apologize to the officers present in the room and Plaintiff complied by apologizing. (Id.) Plaintiff contends that C.O. Martin was dissatisfied with the apology and he directed Plaintiff to apologize using the exact words he proscribed. (Id.) Plaintiff acknowledges that he "pointed [his] finger at C.O. Martin and told him he had inappropriately and dishonestly told my fiancée, as she was being processed into the visiting room, that I had been e-mailing other women." (Id.) Plaintiff states that C.O. Martin "responded by telling me that he would break my fingers off and sent me to medical with my fingers in a bag." (Id.) Plaintiff further states that C.O. Martin said "he would beat [me] three ways to Sunday," which was an expression Plaintiff had never heard. (Id.)

---

[3] The undersigned notes that Kincaid-Wimbish's Declaration is unsigned.

Plaintiff asserts that he then recited the apology as prescribed by C.O. Martin and he was allowed to return to the visiting room. (Id.) Plaintiff states that in the following days, the reported the above incident to the Warden and a SIS officer. (Id.) Plaintiff asserts that he was taken to the SHU sometime before 9:00 a.m. on July 5, 2016. (Id.) Plaintiff asserts that after he was dressed in SHU clothing, C.O. Martin cuffed Plaintiff's wrists behind his back. (Id.) Plaintiff claims that the C.O. Martin "cinched the cuffs with so much force and pressure that [Plaintiff] cried out in pain and protested that the cuffs were too tight." (Id.) Plaintiff states that "C.O. Martin laughed and walked away saying something along the lines of, 'You're lucky that's all I did.'" (Id.) Plaintiff states that he remained in "pain and distress" in the SHU holding cell for an "extended period of time." (Id.) Plaintiff acknowledges that C.O. Martin and another officer eventually came to escorted Plaintiff from the holding cell to his assigned SHU cell. (Id.) Plaintiff states that by the evening, he was in extreme pain "as a result of C.O. Martin having clinched the cuffs so extremely tightly." (Id.) Plaintiff acknowledges that he was examined by medical staff and transported to the local hospital. (Id.) Plaintiff states that he was returned to SHU the same day, or during the very early morning hours of the following day. (Id.) Plaintiff declares that on July 6, 2016, his pain and injury grew progressively worse with his "hand, wrist, and arm swelling and becoming increasingly discolored." (Id.) Plaintiff states that his "pain and distress were off the charts." (Id.) Plaintiff contends that he repeatedly pressed the emergency call button in his SHU cell, but the C.O. that was working in the SHU refused to help Plaintiff. (Id.) Plaintiff states that he was finally seen by medical staff, who sent him "to a local outside hospital - - a different hospital than the one [he] had been sent to the previous night." (Id.) Plaintiff states that he was diagnosed with compartment syndrome and carpal tunnel and he remained in the hospital for several days (Id.) Plaintiff further points out that statements made in his Complaint "were made to the best of my memory and

recollection and with full knowledge of the penalties for perjury." (<u>Id.</u>)

**H.    Declaration of Rosetta Blackburn:**

In her Declaration, Rosetta Blackburn states that on or about March 26, 2016, she traveled to FCI Beckley to visit Plaintiff. (Document No. 42.) Ms. Blackburn stated that as she was being processed into the visiting room, an officer told her that Plaintiff had been e-mailing other women. (<u>Id.</u>) Ms. Blackburn states that she later learned that the officer was C.O. Martin. (<u>Id.</u>) Ms. Blackburn acknowledges that she was "very hurt" upon hearing the above allegation and Plaintiff inquired as to "what was going on." (<u>Id.</u>) Ms. Blackburn states that she told Plaintiff what C.O. Martin had said, and Plaintiff assured her that the statement was not true. (<u>Id.</u>) Ms. Blackburn states that she accepted Plaintiff's assurance and their visit proceeded until another officer approached and express concerns to Plaintiff. (<u>Id.</u>) Ms. Blackburn explains that after some "back-and-forth" between Plaintiff and the officer, Plaintiff was told to accompany the officer to a different room. (<u>Id.</u>) Ms. Blackburn states that Plaintiff complied and was "gone for some time but finally returned to the visiting room." (<u>Id.</u>) Ms. Blackburn states that Plaintiff told her that while he was in the room, he had dispute with C.O. Martin and C.O. Martin had bullied and threatened him. (<u>Id.</u>) Ms. Blackburn further states that a few days later, Plaintiff told her that he had reported the incident to the Warden. (<u>Id.</u>) Finally, Ms. Blackburn states that several months later she learned that C.O. Martin had assaulted Plaintiff "by putting handcuffs on him way too tight." (<u>Id.</u>)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting <u>Bell Atlantic Corporation v. Twombly</u>, 550

U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992); also see Goode v. Central Va. Legal Aide Society, Inc., 807 F.3d 619 (4th Cir. 2015).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary

judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

1.    **The BOP is an Improper Party:**

A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 395 -97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under Bivens must show the violation of a valid constitutional right by a person acting under color of federal law. However, Bivens claims are not actionable against the United States, federal agencies, or public officials acting in their official capacities. See FDIC v. Meyer, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); Berger v. Pierce, 933 F.2d 393, 397 (6th Cir. 1991); Reingold v. Evers, 187 F.3d 348, 355 n. 7 (4th Cir. 1999). To the extent Plaintiff has named the BOP has a defendant in his Bivens action, the BOP should be dismissed. The undersigned, therefore, recommends that

19

the Defendant's "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 35) be granted as to Plaintiff's <u>Bivens</u> claim against the BOP.

## 2.    <u>No Extension of Bivens</u>:

In his Motion, Defendant argues that <u>Bivens</u> liability has not been extended to claims of excessive force in violation of the Eighth Amendment. (Document No. 26, pp. 9 - 22.) Defendant contends that Plaintiff's claim fails under <u>Ziglar v. Abbasi</u>. (<u>Id.</u>) Defendant notes that the United States Supreme Court has only approved a <u>Bivens</u> cause of action in three cases – <u>Bivens</u>, <u>Davis</u>, and <u>Carlson</u>. (<u>Id.</u>, pp. 11 – 13.) Defendant argues that Plaintiff's claim differs in a meaningful way from the above cases, thereby presenting a "new context" subject to a special factor analysis. (<u>Id.</u>) Specifically, Defendant argues that <u>Carlson</u> involve an Eighth Amendment deliberate indifference claim regarding medical care. (<u>Id.</u>) Thus, Defendant concludes that "<u>Carlson</u> is neither legally nor factually similar to Plaintiff's excessive force claim" and the Court must conduct a full <u>Abbasi</u> analysis. (<u>Id.</u>) Under the special factor analysis, Defendant first argues that <u>Bivens</u> should not be extend to Plaintiff's claim because Plaintiff had alternative remedies available. (<u>Id.</u>, pp. 13 – 18.) Specifically, Defendant notes that Plaintiff's alternate remedies included the BOP's administrative remedy program, the FTCA, and state law causes of action. (<u>Id.</u>) Second, Defendant argues that the Court should hesitate to expand <u>Bivens</u> based on the following special factors: (1) Separation of powers concerns and congressional intent; (2) Systemwide impact and costs associated with creation of a <u>Bivens</u> remedy; and (3) The harmful effect on discharge of duties. (<u>Id.</u>, pp. 18 – 21.) As to separation of powers concerns and congressional intent, Defendant states that Congress has enacted the PLRA surrounding prisoner rights. (<u>Id.</u>, pp. 18 – 20.) Defendant argues that because "Congress has chosen not to expand damages remedies after <u>Carlson</u>, this Court should not recognize a new context cause of action." (<u>Id.</u>, p. 20.) As to the systemwide impact and cost,

20

Defendant argues "matter involving prison administration are rarely a proper subject for judicial intervention." (Id., p. 20.) In support, Defendant states there is a "need for unhesitating and decisive action on the part of prison staff when performing inherently dangerous duties has long been undermined by prisoners, who have for years abused the judicially assumed remedy that exposes prison staff to individual liability for violation the constitutional rights of prisoners." (Id., pp. 20 – 21.) Defendant further asserts that "allowing a damages remedy against federal officers in their individual capacities imposes 'substantial costs, in the form of defense and indemnification,' and burdens 'resulting from the discovery and trail process.'" (Id., p. 21.) As to any harmful effect, Defendant contends that creating a Bivens remedy in the context presented here would have a harmful effect on the discharge of official duties by correctional officers. (Id.) Defendant explains that "the harassment of staff by prisoners through the use of the courts chill the officers' judgments and can result in prison staff hesitating before taking swift and crucial action." (Id.) Finally, Defendant contends that "oversight by the court through the creation of a Bivens remedy is not necessary" because a prisoner's allegations of excessive force are referred to the BOP's Office of Internal Affairs and the DOJ's Office of the Inspector General for investigation. (Id.) Accordingly, Defendant concludes that Bivens should not be extend to Plaintiff's Eighth Amendment excessive force claim. (Id.)

In Response, Plaintiff argues that his excessive force claim should not be dismissed based on Abbasi. (Document No. 40, pp. 9 – 10.) Citing Pumphrey v. Coakley, 2018 WL 1359047 (S.D.W.Va. March 16, 2018)(J. Berger), Plaintiff argues that this Court recently considered the above issue and determined that the plaintiff's Eighth Amendment excessive force claim was not an improper expansion of the Bivens remedy. (Id.) Plaintiff, therefore, concludes that "[t]he remarkable similarity between the Pumphrey case and Plaintiff's case ought to lead to the

21

conclusion that the substance of <u>Abbasi</u> does not support dismissal of Plaintiff's <u>Bivens</u> claim in the instant matter." (<u>Id.</u>)

  A <u>Bivens</u> action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. <u>See</u> <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388, 395 -97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). <u>Bivens</u> core premise is to deter individual officers' unconstitutional acts. <u>Correctional Services Corp v. Malesko</u>, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001)(declining to extend <u>Bivens</u> to confer a right of action for damages against private entities acting under the color of federal law). In <u>Bivens</u>, the Supreme Court first recognized that a victim of a Fourth Amendment violation by federal officers may bring suit for money damages against the officers in federal court. <u>Bivens</u>, 403 U.S. at 396, 91 S.Ct. 1999. In the years following the decision in <u>Bivens</u>, the Supreme Court recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment, <u>Davis v. Passman</u>, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, <u>Carlson v. Green</u>, 446 U.S. 14, 100, S.Ct. 1468, 64 L.Ed.2d 15 (1980). Since <u>Carlson</u>, the Supreme Court has consistently refused to extend <u>Bivens</u> liability to any new context or new category of defendants. <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S. at 484-86, 114 S.Ct. 996 (declined to extend <u>Bivens</u> to permit suit against a federal agency); <u>Holly v. Scott</u>, 434 F.3d 287, 290 (4th Cir. 2006)(declining to extend <u>Bivens</u> to an Eighth Amendment claim against employees of a privately operated prison); <u>Lebron v. Rumsfeld</u>, 670 F.3d 540 (4th Cir. 2012)(declining to extend <u>Bivens</u> in a military context). Recently, the Supreme Court made clear the very limited scope of <u>Bivens</u> actions and that "expanding the <u>Bivens</u> remedy is now a disfavored judicial activity." <u>Ziglar v. Abbasi</u>, ___ U.S. ___, 137 S.Ct. 1843, 1857, 198 L.Ed.2d 290 (2017). If the asserted <u>Bivens</u> claim is not one of the three <u>Bivens</u>-type actions previously

recognized by the Supreme Court, closer scrutiny is required. Id.

In Abbasi, the Supreme Court set out a framework for determining whether a claim presents a "new Bivens context." Abbasi, 137 S.Ct. at 1860. As stated above, the Supreme Court has recognized a Bivens remedy in only three cases: (1) A Fourth Amendment claim against federal agents for violating the prohibition against unlawful searches and seizures when they handcuffed a man in his home without a warrant; (2) A Fifth Amendment general discrimination claim against a congressman for firing his female administrative assistant; and (3) An Eighth Amendment claim brought by an inmate's estate against prison officials for failure to provide adequate medical care for his asthma. Id. at 1854-55(citations omitted). The Abbasi Court explained that "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." Id. at 1859. Although the Abbasi Court did not provide "an exhaustive list of differences that are meaningful enough to make a given context a new one," the Court did provide the following "instructive" examples:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

Id. at 1859-60. In the instant case, Plaintiff alleges that Defendant Martin subjected him to cruel and unusual punishment in violation of the Eighth Amendment by subjecting him to excessive force when applying handcuffs too tightly to his wrists. The mere fact that Plaintiff alleges a violation of a constitutional right does not conclusively establish that Bivens extends to Plaintiff's constitutional claim. Thus, the undersigned must first determine whether Plaintiff's excessive force claim presents "a new Bivens context."

Plaintiff correctly indicates that this Court recently addressed the above issue in <u>Pumphrey v. Coakley</u>, 2018 WL 1359047 (S.D.W.Va. March 16, 2018)(J. Berger). In <u>Pumphrey</u>, United States District Judge Irene C. Berger determined that Mr. Pumphrey's Eighth Amendment excessive force claim was not a <u>Bivens</u> expansion. <u>Pumphrey</u>, 2018 WL 1359047 at * 5. Specifically, Judge Berger explained as follows:

> Mr. Pumphrey claims that both Defendants Coleman and Harvey intentionally injured him. He alleges that Defendant Coleman entered his cell and struck him in the face, and that Defendant Harvey put handcuffs on him in a rough manner and intentionally pushed his lower extremities into walls and other objections while Pumphrey was in a wheelchair. These excessive force claims against Mr. Coleman and Mr. Harvey involved direct Eighth Amendment allegations against two individual officers for specific actions taken against an individual inmate. Based on the Supreme Court's examination of an Eighth Amendment cruel and unusual claim and its findings that a damages remedy was appropriate in *Carlson v. Green*, 446 U.S. 14 (1980), the Plaintiff's similar direct Eighth Amendment claim here is not a *Bivens* expansion.

<u>Id.</u> Accordingly, the undersigned finds that Plaintiff's excessive force claim does not present "a new <u>Bivens</u> context."

Even assuming Plaintiff's excessive force claim constitutes "a new <u>Bivens</u> context," the undersigned finds that the Defendant has failed to present any alternative remedies that amounts to a convincing reason for the Judicial Branch to refrain from providing a new freestanding remedy in damages or special factors counselling hesitation in the absence of affirmative action by Congress. In <u>Pumphrey</u>, defendants asserted very similar arguments and Judge Berger explained as follows:

> [E]ven if this case were considered a *Bivens* expansion based on the minor differences in fact between it and *Carlson*, the Court finds appropriate the limited expansion necessary to incorporate cases of this nature given the claims of direct and specific excessive force allegations under the Eighth Amendment. Neither of the Plaintiff's claims at issue in the Defendants' objections implicate policy or policy-making officials, and both are the type of claims that are frequently litigated in the prison context. These claims of direct and specific excessive force are frequently litigated and well-suited to judicial consideration, even absent

24

> congressional action. The Court therefore finds that the Plaintiff's excessive force
> claims under the Eighth Amendment do not involve *Bivens* expansion, and even if
> they did, there is no indication that congressional action is necessary to determine
> whether a *Bivens*-type remedy is available here.

Pumphrey, 2018 WL 1359047 at * 5. Despite the Court's Pumphrey decision, the undersigned will briefly address Defendant's claims. Assuming Plaintiff's excessive force claim is a new Bivens context, the Court must determine whether Bivens should be extended to the above new context. First, the Court should consider "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new freestanding remedy in damages." Wilkie, 551 U.S. at 550, 127 S.Ct. 2588. "[T]he existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." Abbasi, 137 S.Ct. at 1865("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."); Malesko, 534 U.S. at 69, 122 S.Ct. at 515("So long as the plaintiff had an avenue for some redress," a court may decline to provide a new Bivens remedy). Defendant argues that at least three distinct alternative remedies are available – the BOP administrative remedy program, the FTCA, and state law causes of action. As to the administrative remedy program, Defendant merely concludes that such "is an avenue of relief that alone is sufficient to precluded the expansion of Bivens to the excessive use of force context." (Document No. 26, p. 16.) Defendant, however, fails to explain what possible relief is available to Plaintiff in the excessive force context. (Id.) Defendant acknowledge that the administrative remedy program does not provide for monetary relief. (Id.) A review of the record reveals that in response to Plaintiff's administrative remedy filings, the Warden and Administrator Connors informed Plaintiff that his allegations were reported to the appropriate BOP department for an internal investigation, but plaintiff would not be informed of the findings or results. (Document No. 2, pp. 14 and 17.) The undersigned finds this is not a meaningful alternative to a

Bivens remedy in the instant case. <u>Pumphrey</u>, 2018 WL 1359047 at * 5; <u>Jerra v. United States</u>, 2018 WL 1605563 (C.D.Cal. March 29, 2018)(finding that injunctive relief, state tort law, the FTCA, and the BOP administrative remedies did not constitute alternative remedies precluding Bivens relief). In the instant case, Plaintiff alleges that Defendant Martin's single act of excessive force caused Plaintiff extreme pain and required emergency surgery. Thus, the undersigned finds this case to be similar to "*Bivens* or *Davis* in which 'it is damages or nothing.'" <u>Abbasi</u>, 137 S.Ct. at 1862-63.

Next, Defendant contends that the FTCA and state law are appropriate alternative remedies. The Supreme Court, however, has held that the FTCA does not provide an alternative remedial process bearing on the availability of a <u>Bivens</u> remedy. <u>See</u> <u>Carlson</u>, 446 U.S. at 21-23, 100 S.Ct. at 1472-74(stating that the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action"). The FTCA provides at 28 U.S.C. § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages

Inmates may file claims of liability against the United States but may not assert claims of personal liability against prison officials for violations of their constitutional rights under the FTCA. <u>Carlson</u>, 446 U.S. at 21 - 23, 100 S.Ct. at 1472 -74; <u>Bush v. Lucas</u>, 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)(finding that a FTCA claim is not "a substitute for a *Bivens* action"). The FTCA expressly exempts constitutional claims from the FTCA's exclusiveness of remedy rule. Section 2679, however, provides that the FTCA is the exclusive remedy for redress of common law torts committed by federal officials acting within the scope of their office and employment. In order to maintain a case against the United States under the FTCA, Plaintiff must

26

demonstrate that his action is permissible under the FTCA and satisfies the necessary elements of a tort claim cognizable under law of the State in which the action accrued. Thus, the undersigned finds that the FTCA and state tort law is not appropriate alternative remedy concerning Plaintiff's constitutional claim of excessive force. See Linlor v. Polson, 263 F.Supp.3d 613, 621 (E.D.Va. July 11, 2017)(finding that the availability of a claim under the FTCA does not counsel against implying a *Bivens* remedy); Jerra, 2018 WL 1605563 at * 5 (finding that state tort law and the FTCA did not constitute alternative remedies precluding *Bivens* relief).

Irrespective of whether an alternative remedy exists, a Bivens remedy should not be extended where "there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" Abbasi, 137 S.Ct. at 1857(quoting Carlson, 446 U.S at 18, 100 S.Ct. 1468). Although the Supreme Court has not defined what constitutes "special factors counselling hesitation," the Court has observed that "[t]he necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Id. at 1857-58. Put simply, "a factor must cause a court to hesitate before answering that question in the affirmative." Id. at 1858. "[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." Id. at 1865. The Abassi Court explained that since Congress did not provide for a standalone damages remedy against federal jailers when it passed the Prison Litigation Reform Act ["PLRA"], "[i]t could be argued that this suggest Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." Id. The Supreme Court explained as follows:

> Some 15 years after *Carlson* was decided, Congress passed the [PLRA] of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. *See* 42 U.S.C. § 1997e. So it seems clear that Congress

had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs.

Id. The PLRA's exhaustion requirement clearly applies to Bivens actions. Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Supreme Court has further recognized that in enacting the PLRA, Congress intended to "reduce the quantity and improve the quality of prisoner suits." Jones v. Bock, 549 U.S. 199, 203-04, 127 S.Ct. 910, 1666 L.Ed.2d 798 (2007)(citing Porter v. Nussle, 534 U.S. at 524, 122 S.Ct. at 983). Additionally, the Supreme Court has stated that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Turner v. Safely, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987)(citation omitted). The Supreme Court explained that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Id. Since prison administration is a task that has been committed to the responsibility of the legislative and executive branches of government, the Supreme Court has stated that "separation of powers concerns counsel a policy of judicial restraint." Id., 482 U.S. at 85, 107 S.Ct. at 2259. In the instant case, the undersigned notes that Plaintiff's claim arises in a slightly different factual context than Carlson. Plaintiff's claims, however, have similar aspects to Carlson. Both the instant case and Carlson involve Eighth Amendment claims of cruel and unusual punishment against federal prison officials. Similar to finding that deliberate indifference to medical needs constitutes an Eighth Amendment, the Supreme Court has long recognized that excessive force by prison officials consists an Eighth Amendment violation. See Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992)(holding that the excessive force standard applied to an officer who punched an inmate for no apparent reason) As noted by

Judge Berger in <u>Pumphrey</u>, "claims of excessive force are frequently litigated and well-suited to judicial consideration, even absent congressional action." <u>Pumphrey</u>, 2018 WL 1359047 at * 5. Plaintiff further does not challenge any BOP policies, but merely alleges a single incident of excessive force by Defendant Martin. Thus, the foregoing does not cause the undersigned hesitation as to expanding <u>Bivens</u> to Plaintiff's Eighth Amendment excessive force claim. <u>See</u> <u>McLean v. </u>Gutierrez, 2017 WL 6887309, * 18 – 19 (C.D.Cal. Sept. 28, 2017)(finding the Congress' action, or lack therefore, through the PLRA did not amount to a special factor that sufficiently counseled against extending *Bivens* to plaintiff's excessive force claim).

Finally, the <u>Abbasi</u> Court explained that "the decision to recognize a damage remedy requires an assessment of its impact on governmental operations systemwide." <u>Abbasi</u>, 137 U.S. at 1858. The impact on governmental operations systemwide include "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal systems are used to bring about the proper formulation and implementation of public policies." <u>Id.</u> The Supreme Court has emphasized that "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." <u>Wilkie</u>, 551 U.S. at 562, 127 S.Ct. 2588(quoting <u>Bush</u>, 462 U.S at 389, 103 S.Ct. 2404). In <u>Abbasi</u>, the Supreme Court further explained as follows:

> Claims against federal officials often create substantial costs, in the form of defense and indemnification. Congress, then, has a substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government. In addition, the time and administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered.

<u>Abbasi</u>, 137 U.S. at 1856. As stated above, excessive force claims are frequently litigated in the

prison context. Thus, allowing an Eighth Amendment excessive force claim by inmates under Bivens would not clearly result in an increase of suits by inmates. Inmates have long been litigating claims of excessive force. As to the cost associated with the litigation of an excessive force claim, such is not sufficient to cause the Court hesitation in the absence of affirmative action by Congress. Despite the costs associated with litigation, the Supreme Court has clearly expanded Bivens to include deliberate indifference claims under the Eighth Amendment. The cost associated with litigating an excessive force claim under the Eighth Amendment is unlikely to substantially exceed the cost associated with a deliberate indifference claim. Thus, Defendant has not identified any specific special factor that causes the Court hesitation. Accordingly, it is respectfully recommended that the District Court deny Defendant's "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" as to the above argument.

**3.      Eighth Amendment Claim:**

As a general matter, the Eighth Amendment prohibits punishments which "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Thus, under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care,

30

and must 'take reasonable measures to guarantee the safety of the inmates.'")(quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). The Court, however, notes that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while other constitute 'excessive force.'" <u>Thompson v. Commonwealth of Virginia</u>, 878 F.3d 89, 97 (4th Cir. 2017)(citing <u>Whitley v. Albers</u>, 475 U.S. 312, 319-20, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)). In the context of prison officials' use of force upon an inmate, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." <u>Whitley</u>, 475 U.S. at 320-21, 106 S.Ct. at 1078 (citations omitted)(Under the excessive force standard, an inmate must demonstrate that prison officials applied force "maliciously and sadistically for the very purpose of causing harm."); <u>also see</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 130 S.Ct. 1175, 178, 175 L.Ed.2d 995 (2010); <u>Hudson v. McMillian</u>, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (holding that the excessive force standard applied to an officer who punched an inmate for no apparent reason). In determining whether prison officials acted maliciously and sadistically, the following factors must be balanced: (1) "the need for application of force," (2) "the relationship between that need and the amount of force used," (3) "the threat reasonably perceived by the responsible officials," and (4) "any efforts made to temper the severity of a forceful response." <u>Iko v. Shreve</u>, 535 F.3d 225, 239 (4th Cir. 2008)(citing <u>Whitley</u>, 475 U.S. at 321, 106 S.Ct. at 1078). Although the absence of serious injury may be relevant to the determination of prison officials' culpable intent, the lack of an injury is not dispositive. <u>Id.</u>; <u>also see</u> <u>Thompson</u>, 878 F.3d at 98("While

excessive force does require malicious intent, it does not require that the prisoner victim suffer a 'significant injury.' . . . Therefore, a prisoner who suffers a minor, but malicious, injury may be able to prevail on an excessive force claim but not on a deliberate indifference claim."); Wilkins, 559 U.S. at 40, 130 S.Ct. at 1179("The 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"); Hill v. Crum, 727 F.3d 312, 321 (4th Cir. 2013)("[T]he nature of the force, rather than the extent of the injury, is the relevant inquiry.")

Furthermore, the Eighth Amendment does not prohibit "*de minimis* uses of physical force, provided that the use of force is not of the sort repugnant to the conscience of mankind." Harris v. Salley, 339 Fed.Appx. 281, 284 (4th Cir. 2009)(citing Hudson, 503 U.S. at 9 - 10, 112 S.Ct. at 1000). Thus, an inmate who "complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." Wilkins, 559 U.S. at 38, 130 S.Ct. at 1178(citations omitted). It is well recognized, however, that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Hudson, 503 U.S. at 9, 112 S.Ct. at 1000 ("This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."); also see Thompson, 878 F.3d at 101("[W]hen use of force is malicious or repugnant, a plaintiff need to suffer anything significant to establish an excessive force claim.") Although every "malevolent touch" by a prison guard will not give rise to a federal cause of action, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good

fortune to escape without serious injury." <u>Wilkins</u>, 559 U.S. at 38, 130 S.Ct. at 1179; <u>Hudson</u>, 503 U.S. at 9, 112 S.Ct. at 1000.

In his Motion, Defendant argues that "even if a cause of action did exist, there is no constitutional violation." (Document No. 26, p. 22 - 25.) Defendant explains that Plaintiff alleges that Defendant Martin cinched the handcuffs on his wrists too tightly. (<u>Id.</u>, p. 23.) Defendant, however, argues that his "interaction with Plaintiff on the day in question occurred in SHU when he escorted Plaintiff a distance of 102'9" and "all but approximately 15 seconds of which was captured on video." (<u>Id.</u>) Defendant states that "the escort, as videoed, spans from 10:11:04 to 10:12:33, a total of one minute and 39 seconds." (<u>Id.</u>) Defendant contends that "[t]he question before the court, therefore, is whether escorting an inmate for less than 2 minutes, over a distance of less than 121 feet, with handcuffs allegedly on too tight is more than a *de minimis* use of force or is 'repugnant to the conscience of mankind.'" (<u>Id.</u>, pp. 23 – 24.) Even assuming so, Defendant denies that the handcuffs were cinched too tightly and argues that "there is no evidence that the cuffs were in fact placed on too tightly." (<u>Id.</u>, p. 24.) In support, Defendant states that the "objective video evidence shows Plaintiff was in no apparent distress while Defendant Martin and Officer Betkijian escorted Plaintiff to his SHU cell and that the escort was routine." (<u>Id.</u>) Further, Defendant argues that witness statements by Officer Betkijian and Officer Bishop indicate that Plaintiff was neither wincing in pain nor complaining about the restraints being too tight when he was escorted to the SHU cell. (<u>Id.</u>) Defendant states that the internal investigation found insufficient evidence to substantiate Plaintiff's claims against Defendant Martin. (<u>Id.</u>) Finally, Defendant asserts that Plaintiff did not mention to medical staff on the day of incident that Defendant Martin clinched the handcuffs too tight or done so intentionally to cause pain. (<u>Id.</u>) Defendant notes that approximately a week after the incident, Plaintiff told Kincaid-Wimbish that

what happened to his hand was "an accident" and Defendant "Martin didn't mean it." (Id.) Therefore, Defendant concludes that "[w]hile it is unfortunate that Plaintiff may have suffered compartment syndrome to his previously injured wrist, there is nothing to suggest, other than Plaintiff's own allegation in the complaint, that the restraints were applied too tight, that Defendant Martin intended Plaintiff to suffer any harm, that Defendant Martin escorted Plaintiff in any manner for the very purpose of causing harm, or that such limited contact is even repugnant to the conscience of mankind." (Id., p. 25.)

In Response, Plaintiff states there are numerous instances of disputes of material fact. (Document No. 40.) In addition to his sworn Complaint, Plaintiff files an Affidavit setting forth his version of the facts. (Id.) Concerning the video of the escort, Plaintiff notes that such is of little value as it "does not show C.O. Martin putting cuffs on Plaintiff." (Id.) Plaintiff further indicates that he was hesitant to report Defendant Martin's misconduct because Defendant Martin had recently threatened to beat Plaintiff "three ways to Sunday." (Id.)

The undersigned finds that there are genuine issues of material fact. As discussed above in the "Summary of Evidence," the version of events stated by Plaintiff, Defendant Martin, and defense witnesses differ. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of judge . . . ruling on a motion for summary judgment.") These differences in fact are genuine issues of material fact. Specifically, Plaintiff and Defendant disagree as to the facts surrounding the placement of handcuffs on Plaintiff. Plaintiff states that Defendant Martin cuffed the SHU handcuffs on him "extraordinarily tightly" while he was in the SHU visual search cell. Plaintiff further states that he informed Defendant Martin that the cuffs were too tight by stating "whoa, whoa, whoa, it's too tight."

Plaintiff states that Defendant Martin responded that "You're lucky that's all I did to you," then laughed and walked way leaving Plaintiff in the SHU visual search cell for approximately 45 minutes. Defendant Martin and Officer Betkijian state that the SHU cuffs were placed on Plaintiff by Officer Betkijian, Plaintiff remained in the SHU visual cell for less than 5 minutes, and Plaintiff never complained that the cuffs were too tight. Defendant further references a video exhibiting a portion of Plaintiff's escort from the SHU visual cell to the assigned SHU cell. SIA Hussion declares that the total distance between the two locations is 120 feet and 9 inches and the video captured the escort from the base of the Range 3 stairs to the holding cell (1 minute, 39 seconds). Defendant concludes that the 1 minute and 39 second video does not exhibit that Plaintiff was in distress during his escort. Importantly, Plaintiff states that the use of excessive force (placement of the cuffs) occurred in the SHU visual search cell. The video does not show Plaintiff in the SHU visual search cell, and Defendant has not submitted any video that exhibits the length of time Plaintiff was left in the visual search cell. Finally, there is an issue of material fact as to what Plaintiff told the SIS interviewer regarding the incident. SIS Kincaid-Wimbish states that when she inquired as to what happened to Plaintiff's hand, Plaintiff initially responded that "it was not a big deal, it was just an accident, and that Officer Martin 'didn't mean it." Plaintiff disputes the foregoing. Plaintiff states that he never told the SIS interviewer that the incident was an accident, and that when asked if Defendant Martin had intentionally injured him, Plaintiff responded "yes." Thus, the foregoing constitutes genuine issues of material fact. See Anderson, 477 U.S. at 248, 106 S.Ct. at 2510(An issue of material fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")

Viewing the facts in a light most favorable to Plaintiff, a jury could reasonably find that Defendant Martin used excessive force in violation of the Eighth Amendment. Plaintiff claims that

Defendant Martin maliciously and sadistically applied handcuffs too tightly for the purpose of harming Plaintiff. Concerning the first <u>Whitely</u> factor (the need for application of force), the undersigned finds this factor weighs in favor of Defendant Martin. It is reasonable that the application of handcuffs is necessary and appropriate when moving an inmate from one area of a prison to another. Additionally, Plaintiff does not dispute that the application of handcuff was necessary.[4] Consideration of the second <u>Whitely</u> factor (the relationship between the need and amount of force used), weighs in Plaintiff's favor. Viewing the facts in a light most favorable to Plaintiff, the facts indicate that Defendant Martin applied the handcuffs more tightly than necessary. Although the application of handcuffs in the SHU visual search cell may have been necessary because it was unknown if Plaintiff possessed contraband, there is no indication that a search required Plaintiff to be held in the visual search cell for approximately 45 minutes. Considering the third <u>Whitely</u> factor (the threat reasonably perceived by the responsible official), such weighs in Plaintiff's favor. There is no allegation or indication that Plaintiff posed a threat or had a history of slipping or attempting to free himself from restraints. The final factor (any efforts made to temper the severity of a forceful response) also weighs in Plaintiff's favor. Viewing the facts in a light most favorable to Plaintiff, Defendant Martin laughed and ignored Plaintiff's complaint that the cuffs were too tight. Defendant Martin further left Plaintiff in the visual search, with the handcuffs applied too tightly, for approximately 45 minutes. Furthermore, the undersigned finds that Plaintiff's allegations support a finding that Defendant Martin used more than *de minimis* force against Plaintiff as the medical records indicate that Plaintiff suffered injury and swelling to

---

[4] The undersigned notes that on July 1, 2016, four days prior to the above incident, the Orthopedic Surgeon placed Plaintiff's wrist in a splint and noted that "we will allow him to come out of the splint for personal hygiene and for range of motion exercises." (Document No. 25-1, p. 155.)

36

his wrist, which resulted in Plaintiff developing compartment syndrome that required emergency surgery. See McMillian, 503 U.S. at 9, 112 S.Ct. at 995(finding force to be beyond *de minimis* when sufficient to causing bruising, swelling, loosened teeth); Wilkins, 559 U.S. at 40, 130 S.Ct. at 1179(force not *de minimis* where sufficient to cause bruising, lower back pain, migraines, dizziness, and mental anguish). Viewing the facts in a light most favorable to Plaintiff, the undersigned finds that a reasonable jury could credit Plaintiff's sworn statements and find that Defendant Martin maliciously and sadistically applied Plaintiff's handcuffs too tightly for the very purpose of causing harm in violation of the Eighth Amendment. Accordingly, the undersigned respectfully recommends that Defendant's "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" be denied as to the above argument.

### 4.    Qualified Immunity:

In his Motion, Defendant also argues that Plaintiff's excessive force claim is barred by the doctrine of qualified immunity. (Document No. 26, pp. 25 - 26.) Specifically, Defendant argues that he is entitled to qualified immunity because (1) "a Bivens cause of action for damages for excessive force does not exist," and (2) "even if a cause of action existed, the facts of this case show no constitution violation." (Id., p. 26.)

In Response, Plaintiff argues that Defendant is not entitled to qualify immunity. (Document No. 40.) Plaintiff again claims that there are issues of material fact. (Id.) Plaintiff asserts that Defendant's version of the events differs from the Plaintiff's sworn statement of the facts. (Id.) Plaintiff argues that his sworn statement of the facts clearly establishes a constitutional violation. (Id.)

Courts have established qualified immunity for government officials in consideration of a number of factors including the substantial cost of litigation against government officials, the

distraction of government officials from their public responsibilities and the disincentive to responsible and capable persons to accept government positions if there is no protection against suits accusing them of misconduct in the performance of their public duties. Government officials performing discretionary functions are generally protected from civil damages liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In determining the validity of a qualified immunity defense, the Court should be guided by a two-prong test: (1) whether the facts viewed in the light most favorable to the Plaintiff establish a deprivation of an actual constitutional right; and (2) whether that right was clearly established at the time of the purported violation. Id. The sequence of the steps is immaterial following Pearson. The Court may exercise discretion in deciding which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand." Id. at 818. "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Cooper v. Sheehan, 735 F.3d 153, 158 *4th Cir. 2013)(internal quotation marks and citations omitted).

        In the instant case, Defendant first argues he is entitled to qualified immunity because there is no Bivens action for a claim of excessive force. For the reasons stated above, the undersigned rejects this argument. Second, Defendant argues he is entitled to qualified immunity because Plaintiff cannot establish that Defendant violated his constitutional rights. Defendant appears to acknowledge that the Eighth Amendment right to be free from excessive force was clearly established at the time of the allegation violation. Defendant, however, argues that "the facts of this case show no constitutional violation occurred." As explained above, the undersigned has

38

concluded there are issues of material fact regarding Defendant's alleged use of force upon Plaintiff. For the reasons explained above, the undersigned finds that when viewing the facts in a light most favorable to Plaintiff, Plaintiff could establish a violation of his Eighth Amendment right to be free from excessive force. When both the resolution of the qualified immunity question and the case itself depends upon a determination of what actually happened, summary judgment on grounds of qualified immunity is not proper. Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995); Hinojos v. Bowers, 2015 WL 4878812, * 8 (D.S.C. Aug. 14, 2015)(citations omitted)("[T]he court holds that there is a genuine issue of material fact as to whether [the defendant] used excessive force against [plaintiff]; therefore, the court cannot determine at the summary judgment phase that [the defendant's] actions were objectively reasonable for purposes of granting qualified immunity.") The undersigned, therefore, respectfully recommends that Defendant's "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" be denied as to the above argument.

## PROPOSAL AND RECOMMENDATION

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **DENY as moot** Defendant Martin's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 25) and **GRANT in part and DENY in part** Defendant Martin's "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 35). Specifically, the undersigned recommends that Defendant Martin's "Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 35) be **GRANTED** to the extent Plaintiff is asserting a Bivens claim against the BOP. The undersigned recommends that Defendant Martin's "Supplemental Motion to Dismiss, or in the Alternative,

39

Motion for Summary Judgment" (Document No. 35) be **DENIED** as to Defendant's arguments based on following: (1) "There is no implied damages remedy for excessive use of force;" (2) "Even if a cause of action did exist, there is no constitutional violation;" and (3) "The Defendant is entitled to qualified immunity."

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Berger and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: August 10, 2018.

Omar J. Aboulhosn
United States Magistrate Judge

40